UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CHARICE GIDDINGS, | CASE NO. 5:21-CV-00217-DAR |
| Plaintiff, | JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff Charice Giddings filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying supplemental security income (SSI) and disability insurance benefits (DIB).[1] (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On January 28, 2021 pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry of February 18, 2022). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the matter for additional proceedings consistent with this recommendation.

---

[1]    Ms. Giddings' DIB application was deemed filed for the purpose of establishing entitlement to Medicare benefits as a qualified employee. (*See* Tr. 16; 20 C.F.R. § 404.1018b).

## PROCEDURAL BACKGROUND

Ms. Giddings filed for DIB for the purpose of establishing Medicare benefits as a qualifying employee on May 5, 2015 and for SSI on July 20, 2018, alleging a disability onset date of November 6, 2006. (Tr. 275, 231). Her claims were denied initially and on reconsideration.[2] (Tr. 231, 252, 275). She then requested a hearing before an Administrative Law Judge. (Tr. 333).

Ms. Giddings (represented by counsel), and a vocational expert (VE) testified at a hearing before the ALJ on March 19, 2020. (Tr. 178-205). On April 17, 2020, the ALJ issued a written decision finding Ms. Giddings not disabled. (Tr. 16-30). The Appeals Council denied Ms. Giddings' request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Ms. Giddings timely filed this action on January 28, 2021. (ECF #1).

## FACTUAL BACKGROUND

### I. ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Giddings and VE Ja'Nitta Marbury, presented during the hearing before the ALJ.

Ms. Giddings testified she graduated from high school and worked for the Summit County Fiscal Office for eleven years. (Tr. 187). While working for the County, Ms. Giddings also held a part-time job with a cleaning company. (*Id.*). She lives with her aunt and her daughter. (Tr. 185). She has not worked since 2011 and her aunt is the financial provider of the household. (*Id.*). Ms. Giddings does not drive and has not had a driver's license since 2005. (Tr. 186). She used to take

---

[2] The DIB claim was addressed in a prior written decision before Ms. Giddings filed her SSI claim. (*See* Tr. 206-230).

2

public transportation, but it hurts her legs to sit on the hard bus seats. (*Id.*) Waiting for the bus also is a problem for her. (*Id.*).

Ms. Giddings experiences excruciating pain in her pelvis, left leg, left foot, and left hip. (Tr. 190). In the last four years, she has fallen because her left leg and foot go completely numb. (Tr. 193). Ms. Giddings uses a cane for walking and for balance while standing. (Tr. 194). Her primary care physician prescribed the cane in 2011. (*Id.*). Ms. Giddings reported using the cane more now than she did in 2011. (*Id.*).

Ms. Giddings had surgery in 2019 that made her pain worse, claiming: "My SI joint is affected as well as the hernia mesh has shifted, and my body is rejecting it." (*Id.*). She is able to sit for about fifteen minutes before feeling a stabbing pain in her left leg and hip. (Tr. 195). Ms. Giddings can stand for ten or fifteen minutes before her leg goes out. (*Id.*). She can walk with her cane for about fifteen to twenty minutes. (*Id.*). She denied being able to lift and carry any weight. (*Id.*).

Ms. Giddings typically wakes up at 6:00 a.m. to take her morning medications. (Tr. 196). She usually goes back to sleep because the medications make her drowsy. (*Id.*). She wakes up again around 10:00 a.m. or 11:00 a.m. (*Id.*). Ms. Giddings does little else to fill her day, except attend counseling appointments with Portage Path. (Tr. 198). Ms. Giddings goes to Portage Path every three months for prescription refills. (*Id.*). She meets with a counselor from Families First twice a week. (*Id.*). These meetings are either by telephone or at Ms. Giddings' residence. (*Id.*). Ms. Giddings experiences mental health symptoms including anger, fear, and anxiety or panic attacks. (Tr. 198-99). She has good and bad days. (Tr. 199).

Ms. Giddings relies on her daughter for help with bathing and fixing her hair. (Tr. 196). She has difficulty bending over and has fallen getting in and out of the tub. (*Id.*). The last time Ms. Giddings prepared her own meals was in September 2018, when she burned her hands on the stove after her leg gave out. (*Id.*). The pain and difficulty bending keeps her from performing household chores. (Tr. 196-97). Climbing stairs is also difficult for her. (Tr. 197).

The VE then testified. The ALJ identified Ms. Giddings' past relevant work as a file clerk II (DOT 206.367-014, specific vocational preparation (SVP) 3, light exertion) and general office clerk (DOT 219.362-010, SVP 4, light exertion). (Tr. 189, 200-01).

The ALJ then asked the VE whether a hypothetical individual of Ms. Giddings' age, education, and work experience could perform Ms. Giddings' past relevant work if limited to light work and subject to the following restrictions: standing/walking for two hours in an eight-hour workday; would require an assistive device for walking on uneven terrain or prolonged ambulation; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; avoid unprotected heights, moving mechanical parts, and operation of motor vehicles; limited to simple, routine, repetitive tasks, but not at a production rate pace; occasionally interact with supervisors, coworkers, and the public; and few changes in a routine work setting. (Tr. 201). The VE testified such an individual could not perform Ms. Giddings' past relevant work. (*Id.*). The VE identified other positions the hypothetical individual could work, including as a small parts assembler (DOT 706.684-022, SVP 2), storage facility clerk (DOT 295.367-026, SVP 2), and mail clerk (DOT 209.687-026, SVP 2). (Tr. 201-02).

If the same hypothetical individual was limited to work at the sedentary exertion level, but remained subject to all the same restrictions, the individual could work as a table worker (DOT

4

739.687-182, SVP 2), final assembler (DOT 713.687-018, SVP 2), and addresser (DOT 209.587-010, SVP 2). (Tr. 202-03). The same hypothetical individual would be precluded from all work if the person required one extra break every hour for up to ten minutes. (Tr. 203). The VE testified that employers tolerate an employee being off task up to ten percent of the workday and will tolerate one absence per month. (*Id.*).

The VE testified all work would be precluded if an individual were limited to sedentary activity and restricted to lifting and carrying three pounds, required a cane for ambulation and standing, and required a sit/stand option. (Tr. 203-04).

## II. PERSONAL EVIDENCE

Ms. Giddings was 33 years old at the time of her alleged onset date, and 46 years old at the time of the administrative hearing. (Tr. 232).

## III. RELEVANT MEDICAL EVIDENCE[3]

Ms. Giddings has a history of abdominal and pelvic surgeries, including an umbilical hernia repair, exploratory laparoscopies with dilatation and curettage, and a total hysterectomy in 2006 for endometriosis. (Tr. 596). She also has recurrent, painful outbreaks of herpes simplex virus 2 (HSV2), which was first diagnosed in 1998. (Tr. 641).

In June 2011, Ms. Giddings complained of low back, left leg, groin, and chronic pelvis pain. (Tr. 566). She reported walking made her pain worse. (*Id.*). A lumbar MRI from June 2011 revealed mild disc space narrowing with a small broad-based posterior disc bulge without canal

---

[3]     Ms. Giddings challenges address only her physical ailments, except for a brief argument that her pain had an affect on her mental health. (*See* Pl.'s Br., ECF #15, PageID 2501). Therefore, the relevant medical evidence relates mainly to her physical ailments. She waives issues which are averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation. *Kennedy v. Comm'r of Soc. Sec.*, 87 Fed. App'x 464, 466 (6th Cir. 2003).

stenosis and minimal bilateral foraminal narrowing at L4-L5, and mild to moderate disc space narrowing with some disc dehydration and broad-based posterior disc bulge without central canal stenosis and mild bilateral foraminal narrowing at L5-S1. (Tr. 610). Additionally, the MRI showed some mild degenerative changes to the appearance of the facet joints. (*Id.*). A thoracic MRI was deemed unremarkable. (Tr. 609). Her doctor prescribed a straight cane. (Tr. 555).

In early 2012, Ms. Giddings followed up with her primary care physician after going to the emergency department for abdominal pain and pain at the left inner thigh and groin area, and perineum pain that radiates to the umbilicus. (Tr. 551). Abdominal and pelvic CT scans were normal in 2013 and 2014. (Tr. 605, 607).Ms. Giddings described the same pain for years to various providers. (*See* Tr. 520, 527, 529, 531, 535, 540-41, 544, 543, 544, 546, 549, 765, 768, 770, 775, 778, 783, 788, 793, 797, 802, 811, 816, 820, 825, 836, 841, 846).

Ms. Giddings described her pain as throbbing, burning, and aching. (Tr. 765). Her providers at Ohio Pain and Rehab Specialists consistently noted an antalgic gait and use of a cane, tenderness at L4-L5, L5-S1, and at the left sacroiliac joint, a restricted extension of the lumbar spine and decreased sensation in the left thigh. (Tr. 768, 773, 778, 781, 786, 791, 800, 809, 813-14, 818-19, 822, 827, 833, 839, 844, 849).

On February 6, 2017, Ms. Giddings' orthopedist, Nilesh Shah, M.D., informed her that her pain was not musculoskeletal in nature and felt her issues could be related to her multiple prior surgeries. (Tr. 684).

On May 15, 2017, Ms. Giddings' neurologist informed her that there is no underlying primary neurological reason for her pain, but felt the pain could be post-infectious neuralgia and

post-surgical scarring. (Tr. 626). In May 2017 and April 2018, Ms. Giddings received bilateral L4-L5 and L5-S1 facet joint medial branch injections with limited benefit. (Tr. 793, 797).

In late 2017, Ms. Giddings returned to Jenn Winning, WHNP, at Summit Urogynecology and requested a new prescription for pelvic floor physical therapy (PFPT). (Tr. 907). Ms. Giddings reported she continued to use vaginal Valium suppositories, heat, and rest for her pelvic pain. (*Id.*). During a follow-up appointment with NP Winning in May 2018, she noted minimal improvement with PFPT twice monthly. (Tr. 910). Ms. Giddings reported frequent HSV2 outbreaks and believed those contribute to her pain. (*Id.*). NP Winning continued PFPT and reordered vaginal Valium suppositories. (Tr. 912).

Ms. Giddings attended physical and aquatic therapy from January 2018 to May 2018 for pelvic and groin pain. (Tr. 717, 721, 724, 725, 727, 729, 732, 734, 744, 746, 748).

On May 5, 2018, Ms. Giddings received a left sacroiliac joint anesthetic and steroid injection to address left SI joint pain and tenderness. (Tr. 783). She noted short term benefit. (*Id.*).

On July 3, 2018, Ms. Giddings received a left sciatic nerve anesthetic and steroid injection into the piriformis muscle. (Tr. 765). She reported significant short-term benefit with the pain returning after a week. (*Id.*). On July 10, 2018, she started lidocaine IV treatment for widespread chronic pain, but shortly after treatment began her blood pressure rose and treatment was discontinued. (*Id.*).

In October 2018, a lumbar spine X-ray showed mild disc space narrowing at L5-S1 and facet arthrosis at L4-L5. (Tr. 1012). A lumbar MRI showed mild facet and ligamentum flavum degenerative hypertrophy at L3-L4, and small broad-based disc bulges with mild facet degenerative hypertrophy and mild bilateral neural foraminal narrowing at L4-L5 and L5-S1. (Tr. 1069). An

MRI of Ms. Giddings' left hip joint revealed a degenerative signal within the anterosuperior labrum without definite evidence of a tear; partial-thickness cartilage loss of the superior and anterosuperior acetabulum with mild subchondral bone marrow edema of the anterosuperior acetabulum; a mild cam type femoroacetabular impingement with borderline acetabular retroversion; mild sacroiliatic joint osteoarthritis; mild bilateral gluteus minimus and medius tendinosis and low-grade insertional tearing of the left gluteus medius; and mild left greater trochanteric bursitis. (Tr. 1071).

In November 2018, Ms. Giddings met with her orthopedist, Nilesh Shah, M.D., who informed her that the MRIs do not show a significant reason for her pain. (Tr. 969-70). Dr. Shah discussed performing a diagnostic ultrasound to look for nerve entrapment, in relation to Ms. Giddings' concerns about scar tissue from previous surgeries. (Tr. 970).

In December 2018, a nerve ultrasound revealed entrapment of the ilioinguinal nerve with moderate neuritis in the inguinal canal, corresponding to her pain. (Tr. 1066).

In January 2019, Ms. Giddings met with surgeon John Zografakis, M.D., to consider surgical intervention for the entrapped ilioinguinal nerve. (Tr. 1104). Dr. Zografakis discussed a division of the ilioinguinal nerve and the round ligament. (Tr. 1108). He cautioned Ms. Giddings that the surgery would result in permanent numbness over the mons and left inguinal region and possibly incomplete resolution of her pain. (*Id.*). Ms. Giddings agreed to the procedure. (*Id.*).

On March 27, 2019, Dr. Zografakis performed a left groin exploration surgery with division of the ilioinguinal nerve and a left inguinal hernia repair with mesh. (Tr. 1307). Dr. Zografakis's postoperative diagnosis was chronic left inguinal pain and ilioinguinal neuralgia. (Tr. 1362).

In April 2019, Ms. Giddings saw Emily Jacobs, PA-C, for pain management and reported residual shooting pain in her left groin and inner thigh with numbness in the left heel. (Tr. 1423). Her gait was antalgic, and she ambulated with a cane. (Tr. 1424). She displayed tenderness over the lumbar spine and tenderness at the left sacroiliac joint, and decreased sensation at the left thigh. (*Id.*).

On May 7, 2019, Ms. Giddings saw Dr. Nilesh and reported some benefit with surgery, but she continued to have pain. (Tr. 1639-40, 1647). Ms. Giddings explained that she walks a lot, and has pain with sitting and daily activities, such as bending to put on her shoes. (Tr. 1640). Examination of her left hip revealed pain with internal rotation and mild decreased motion, normal external rotation without significant discomfort, and pain with deep flexion of the hip. (Tr. 1646). The doctor referred her to physical therapy. (Tr. 1467). On May 20, 2019, Ms. Giddings returned to the pain management office and again reported residual shooting pain in her left groin and inner thigh with numbness in the left heel. (Tr. 1420). Ms. Giddings gait was antalgic and she ambulated with a cane. (Tr. 1421). She displayed tenderness over the lumbar spine and tenderness at the left sacroiliac joint, and decreased sensation at the left thigh. (*Id.*).

In June 2019, Ms. Giddings informed her urogynecologist of continued pelvic pain despite the surgery. (Tr. 1413). She also informed her pain management provider of increased left groin pain and increased sensitivity post-surgery. (Tr. 1417). Ms. Giddings' gait was antalgic, and she ambulated with a cane. (Tr. 1418). She displayed tenderness over the lumbar spine and left sacroiliac joint, restricted lumbar extension, hyperesthesia to touch of her surgical scar, and decreased sensation in the left thigh. (*Id.*).

In July 2019, Ms. Giddings returned to Dr. Nilesh's office and reported increased pain, located in the anterior groin, in the lower back over the SI joint, and that she was experiencing an HSV2 outbreak. (Tr. 1651). Walking and all activity exacerbated her pain, whereas pain medication helped. (*Id.*). Dr. Nilesh noted that motion of her hip joint caused significant discomfort in the groin and to the SI joint area, as did placing axial load to the femur. (Tr. 1657-58). Dr. Nilesh stressed to Ms. Giddings that it is difficult to determine what is causing her pain and there may be multiple reasons for it. (Tr. 1658). His notes indicate he would consider ultrasound-guided hip joint and SI joint injections "as she may have multiple pain generators." (*Id.*).

In August 2019, Ms. Giddings returned to the pain management clinic with the same reports of worsened pelvic pain that radiates into her left leg, causing numbness. (Tr. 1667). She felt the Norco helped, but she continued to have days with increased pain. (*Id.*). Ms. Giddings was using a cane and displayed an antalgic gait. (Tr. 1668). She had tenderness over the low lumbar region and SI joint, restricted motion with lumbar extension, and decreased sensation in the left thigh. (*Id.*). Her provider refilled her prescriptions for Norco and gabapentin. (Tr. 1669). In September 2019, she received Norco and an increased dosage of gabapentin. (Tr. 1701).

On September 16, 2019, Ms. Giddings went to the emergency room for bilateral hip pain, pelvic pain, and pain from an HSV2 outbreak. (Tr. 1712, 1716). Physical examination was normal except she had limited range of motion in her bilateral hips. (Tr. 1722). She received morphine and Zofran and was discharged the following day in stable condition. (Tr. 1723-24).

On October 21, 2019, Ms. Giddings underwent a thyroid ultrasound that revealed some nodules that were biopsied and tested, the results of which were benign. (Tr. 1842-44, 1811).

On October 22, 2019, Ms. Giddings returned to the pain management clinic, where the doctor noted she appeared in moderate discomfort. (Tr. 1767). She reported continued pain, walked with an antalgic gait and used a cane, had lower lumbar and SI joint tenderness, restricted lumbar extension, and decreased sensation at the left thigh. (Tr. 1767-68). Ms. Giddings reported she did not take gabapentin for a few days and felt a difference in nerve pain, indicating the gabapentin helped with the pain. (Tr. 1768). She received refills for Norco and gabapentin. (*Id.*). These complaints, physical examination findings, and prescription refills continued through December 2019. (Tr. 1892-95).

On January 29, 2020, Ms. Giddings met with Anantha Reddy, M.D., for her continued back, leg, and groin pain. (Tr. 2249). On physical examination, Dr. Reddy noted an antalgic gait, focal sensory deficit at the left anterior thigh, and general tenderness to the bilateral paraspinal lumbar musculature. (Tr. 2254). The examination was otherwise normal. (*Id.*). Based on Ms. Giddings' chronic pain post-surgery, Dr. Reddy referred her for a general surgery opinion and ordered an EMG to rule out lumbar radiculopathy and ilioinguinal entrapment neuropathy. (Tr. 2255). Ms. Giddings met with Clayton Petro, M.D., in February 2020 for a surgical opinion. (Tr. 2257). A new groin ultrasound was ordered to "evaluate current ilioinguinal nerve inflammation." (Tr. 2263).

## IV.    MEDICAL OPINIONS

State agency medical consultant Linda Hall, M.D., adopted the prior ALJ's physical residual functional capacity assessment. (Tr. 247). The adopted RFC includes the following limitations: sedentary exertion; can lift twenty pounds occasionally, ten pounds frequently; can sit for six hours, stand for two hours, and walk for two hours in an eight-hour workday, and needs a

handheld device for uneven terrain or prolonged ambulation; can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; can occasionally stoop, kneel, crouch, and crawl; can never work at unprotected heights or around moving mechanical parts; and can never operate a motor vehicle. (Tr. 247).

On reconsideration, State agency medical consultant Rannie Amiri, M.D., concluded there was new and material evidence or changed circumstances affecting the findings and did not adopt the prior ALJ's RFC. (Tr. 270). Dr. Amiri opined Ms. Giddings can lift twenty pounds occasionally, ten pounds frequently; can stand and walk for two hours in an eight-hour workday; can sit for six hours in an eight-hour workday; can climb ramps and stairs occasionally, but never climb ladders, ropes, or scaffolds; can occasionally balance, kneel, stoop, crouch, and crawl; can never work at unprotected heights or around moving mechanical parts; and can never operate a motor vehicle. (Tr. 270).

State agency psychological consultants Paul Tangeman, Ph.D, and Carl Tishler, Ph.D., adopted the prior ALJ's mental residual functional capacity assessment from October 25, 2017. (Tr. 247, 271). The adopted RFCs included limitations to the performance of simple, routine tasks without fast-paced production requirements; occasional interactions with supervisors, coworkers, and the public; and few changes in a routine work setting. (*Id.*).

## V.  OTHER RELEVANT EVIDENCE

On October 10, 2019, Tim Verdouw, OTR/L, conducted a Physical Residual Functional Capacity Assessment to determine Ms. Giddings' tolerance to perform work tasks. (Tr. 1940-53). Mr. Verdouw took Ms. Giddings through a series of physical tests to determine spinal range of motion, upper and lower extremity range of motion and strength, thumb, hand, and finger range

of motion and strength. (Tr. 1946-49). The report contains narratives regarding her demonstrated functional abilities for grasping, pinching, and fine and gross motor skills, walking, reaching, bending, squatting, kneeling, static and dynamic balance, crawling, lifting, carrying, pushing, pulling, climbing, sitting, and standing. (Tr. 1950-53). The report included opinions about the reliability of Ms. Giddings' reported pain, supported by observations of associated pain behavior and mechanical change. (Tr. 1950-51).

Based on the results of the assessment, Mr. Verdouw concluded Ms. Giddings could perform light physical work for up four hours and nineteen minutes per day, could lift zero pounds to below the waist and three pounds to shoulder height, push with 11 horizontal force pounds and push 15 horizontal force pounds. (Tr. 1940). Mr. Verdouw reported Ms. Giddings demonstrated occasional tolerance for above shoulder reaching, bending, fine coordination, firm grasping, gross coordination, pinching, simple grasping, and walking; frequent tolerance for forward reaching; and such limited tolerance so as to avoid dynamic and static balancing, crawling, repetitive kneeling, substantial kneeling, ladders, squatting, and stair climbing. (Tr. 1940).

## THE ALJ'S DECISION

The ALJ's decision, dated April 17, 2020, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act for Medicare purposes through December 31, 2016.

2. The claimant engaged in substantial gainful activity during the following periods: November 2006 through November 2011 (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining

findings address the period(s) the claimant did not engage in substantial gainful activity.

4.  The claimant has the following severe impairments: lumbar degenerative disc disease, endometriosis, recurrent arrhythmias, personality disorder, anxiety disorder, depressive disorder, glaucoma, hernias, osteoarthritis left hip, and status post ilioinguinal nerve excision (20 CFR 404.1520(c) and 416.920(c)

5.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

6.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she requires an assistive device for uneven terrain or prolonged ambulation. The claimant can climb ramps and stairs occasionally, never climb ladders, ropes, or scaffolds, balance occasionally, stoop occasionally, kneel occasionally, crouch occasionally, crawl occasionally. The claimant can never work at unprotected heights, never with moving mechanical parts, and never operating a motor vehicle. The claimant is able to perform simple, routine, and repetitive tasks but not at a production rate pace; with occasional interaction with coworkers, supervisors, and the public; and is able to tolerate few changes in a routine work setting.

7.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.  The claimant was born on May 19, 1973 and was 33 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

12.     The claimant has not been under a disability, as defined in the Social Security Act, from November 6, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-29).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference.

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

Moreover, an ALJ must provide a discussion at each step of the sequential evaluation "in a manner that permits meaningful review of the decision." *Boose v. Comm'r of Soc. Sec.*, 3:16cv2368, 2017 WL 3405700 at *7 (N.D. Ohio June 30, 2017) (quoting *Snyder v. Comm'r of Soc. Sec.*, 5:13cv2360, 2014 WL 6687227 at *10 (N.D. Ohio Nov. 26, 2014)). "[I]t is more than merely helpful for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review." *Rogers*, 486 F.3d at n.5.

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Ms. Giddings claims the ALJ erred in his evaluation of the Functional Capacity Evaluation performed by a physical therapist, claims he erred in his evaluation of her complaints of pain, and argues that new and material evidence warrants remand. (Pl.'s Br., ECF #15, PageID 2471). I address each claim in turn.

**Evaluation of "Other Source" Material**

The ALJ addressed the physical therapist's Functional Capacity Evaluation as follows:

> She had a functional capacity evaluation with a physical therapist on October 10, 2019, which placed her in the light physical demand for part time work with alternating sitting and standing. She lifted 0 weight below waist, 3 pounds to shoulder height, and pushed 15 pounds and pulled 11 pounds, with occasional tolerance for above shoulder reach, bending, fine coordination, firm grasping, grasp coordination, pinching, simple grasping, and walking. She should avoid dynamic balance, static balance, crawling, repetitive and sustained kneeling, ladders, squatting, and stair climbing. This opinion is not persuasive, as it is not from an acceptable medical source, and the records support a restriction to sedentary exertion, but do not support a restriction to part time work.

(Tr. 28).

Ms. Giddings argues the ALJ did not properly evaluate the physical therapist's Functional Capacity Evaluation findings. (*Id.* at PageID 2495). She admits Mr. Verdouw, as a physical therapist, is not, by regulation, considered an acceptable medical source. (*Id.*). But she further asserts his report is categorized as an "other source" of information that should be evaluated in accordance with SSR 06-03p. (*Id.*). In pertinent part, this Ruling provides that "other sources" of information "are important and should be evaluated with key issues such as impairment severity and functional effects, along with other relevant evidence in the file." SSR 06-03p. The

Commissioner responds that the ALJ considered the opinion but found it unpersuasive, and under the revised regulations the ALJ was not obligated to give the opinion any special weight or deference. (Comm'r's Br., ECF #17, PageID 2515-16).

The ALJ evaluated the medical opinions in terms of persuasiveness under the regulations found in 20 C.F.R. § 416.920c. Under these regulations, the ALJ is to articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. § 416.920c(b). The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *Id.* at § 416.920c(a); *see also Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors"—supportability[4] and consistency.[5] *Id.* at § 416.920c(b). An ALJ must explain how he or she considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 416.920c(b)(2), (3).

---

[4]    "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[5]    "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

Although the regulations presented in 20 C.F.R. § 416.920c eliminate physician hierarchy, deference to specific medical opinions, and assigning controlling (or other) weight to a treating physician's medical opinion, an ALJ must still articulate how the medical opinions were considered and how persuasive they were found. *Houston v. Saul*, No. 1:20-CV-1371, 2021 WL 2635376, at *11 (N.D. Ohio June 25, 2021). An ALJ is not required to articulate how he or she considered evidence from nonmedical sources using these requirements in § 416.920c(a)-(c). *See* § 404.1520(d).

Ms. Giddings asserts the Agency considers "other sources" information as "important and should be evaluated with key issues such as impairment severity and functional effects, along with other relevant evidence in the file." SSR 06-03p. Citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007), Ms. Giddings argues that "[o]pinions from non-medical sources who have seen the [Plaintiff] in their professional capacity should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." (Pl.'s Br., ECF #15, PageID 2496).

The Commissioner replies that *Cruse* is inapposite because it was decided under the former regulations governing the evaluation of medical opinions. (Comm'r's Br., ECF # 17, PageID 2517). The former regulations governing the evaluation of medical opinions also governed the evaluation of opinions from medical sources who are not acceptable medical sources and from nonmedical sources, requiring the ALJ to consider the opinions using the same factors as applied to evaluation medical opinions, and that the ALJ "generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's

20

reasoning, when such opinions may have an effect on the outcome of the case." 20 C.F.R.

§ 416.927(f). The revised regulations changed the way medical opinions are to be articulated, but

only state that the ALJ is "not required to articulate how [he] considered evidence from

nonmedical sources using the requirements" with which the ALJ considers medical opinions. *Id.* at

§ 416.920c(d). The revised regulations leave a void regarding how an ALJ is to articulate his

consideration of an opinion from a nonmedical source or one who is not considered an acceptable

medical source.

However, the revised regulations require the ALJ to consider every medical opinion and to

articulate how he considered the supportability and consistency of the opinions. *Id.* at §

416.920c(b). When explaining what is meant by "consistency," the revised regulations instruct and

ALJ to consider "evidence from other medical sources and nonmedical sources in the claim." 20

C.F.R. § 416.920c(c)(2).

Here, the ALJ determined the physical therapist's opinion was inconsistent because the

record supports a restriction to sedentary exertion and does not support a restriction to part-time

work. Indeed, whether Ms. Giddings is able to work is an opinion expressly reserved for the

Commissioner. 20 C.F.R. § 416.927. The ALJ's rejection of that particular opinion is reasonable.

*See* 20 C.F.R. § 416.927(d)(3). But while the physical therapist's summary page concluded Ms.

Giddings could perform light exertion, a look at the opined limitations contained in the report,

including lifting limited to three pounds, total sitting time of two hours and sixteen minutes, total

standing time of one hour and seventeen minutes, and the restriction to occasional walking,

21

appear more consistent with how the Agency's regulations define sedentary exertion.[6] It is not at all clear whether the ALJ considered the substance of the FCE, given that the report contains a sizeable amount of information relevant to Ms. Giddings' impairment severity and functional effects, including, as described above, results of functional testing supportive of his conclusions. None of this information was referred to in the written decision. Because it is not apparent whether the ALJ considered the contents of the FCE in accordance with Agency policy and regulations, I conclude that a meaningful review of the ALJ's decision is not possible.

Without clear indication that the ALJ considered the contents of the FCE, I also cannot determine if the ALJ's decision is supported by substantial evidence. It bears repeating that "[s]ubstantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security,* 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

This is not harmless error and requires remand. The VE testified all work would be precluded if an individual were limited to sedentary activity and restricted to lifting and carrying three pounds, required a cane for ambulation and standing, and required a sit/stand option. (Tr. 203-04). The physical therapist opined Ms. Giddings would be similarly limited. If the ALJ considered the contents of the FCE report and concluded similar limitations were warranted, it

---

[6]    "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a). The term has the same meaning as it has in the Dictionary of Occupational Titles (DOT). § 416.967.

may have warranted a determination that Ms. Giddings is precluded from all work. Because appropriate analysis was not contained in the ALJ's written opinion, meaningful review by the District Court is impeded, requiring remand.

**Subjective Statement and Pain Analysis**

Ms. Giddings contends the ALJ did not properly evaluate her symptoms and statements of pain. (Pl.'s Br., ECF #15, PageID 2498). She indicates the ALJ cherry-picked and overlooked contrary lines of evidence. (*Id.* at PageID 2498-99).

The Commissioner responds that the ALJ fairly and accurately summarized the medical evidence, and his findings with respect to Ms. Giddings' pain were supported by substantial evidence. (Comm'r's Br., ECF # 17, PageID 2522). Moreover, the Commissioner cites to *Lee v. Berryhill*, No. 1:17CV1865, 2018 WL 3970553, at *3 (N.D. Ohio Aug. 20, 2018), noting that the ALJ is not required to list every self-reported symptom, so long as he or she considers all of claimant's medically determinable impairments and the opinion is supported by substantial evidence. (*Id.* at PageID 2522-23).

An ALJ follows a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second stage, the ALJ considers all relevant evidence, including:

(1)     a claimant's daily activities;
(2)     the location, duration, frequency, and intensity of pain or other symptoms;
(3)     factors that precipitate and aggravate the symptoms;

23

> (4)    the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
>
> (5)    treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;
>
> (6)    any measures other than treatment an individual uses or used to relieve pain or other symptoms; and
>
> (7)     any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

*Id.* The ALJ is not required to analyze all seven factors, but only those factors germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

Here, because it is unclear whether the ALJ considered the contents of the physical therapist's FCE, which contained statements of pain from Ms. Giddings, examiner observations of mechanical change and pain behavior supportive of her reports of pain, and other information concerning her functional restrictions due to pain, I cannot conclude that the ALJ's subjective symptom analysis considered all relevant evidence in accordance with Agency policy and regulations.

This is also not harmless error and remand is warranted. Had the ALJ properly considered the contents of the FCE report, he may have determined that Ms. Giddings' statements about the intensity and persistence of her symptoms and their functional effects were consistent with other evidence of record, and that those functional limitations precluded Ms. Giddings from engaging in work-related activities.

**New and Material Evidence**

Finally, Ms. Giddings claims new and material evidence warrants remand for consideration. (Pl.'s Br., ECF #15, PageID 2502).

24

Sentence Six of 42 U.S.C. § 405(g) permits the Court to remand the case for further administrative proceedings without ruling on the merits. A claimant seeking remand based on Sentence Six of § 405(g) bears the burden of showing (1) the evidence at issue is both new and material, and (2) there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986); *see also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

Evidence is new if it was not in existence or available to the claimant at the time of the administrative proceeding. *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990). Therefore, evidence available during the pendency of the administrative proceedings that was not obtained and submitted to the Commissioner in a timely manner is not "new evidence." *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477 (6th Cir. 2006).

Evidence is material if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). A post-decision evaluation is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition. *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 277-278 (6th Cir. 2010); *see also Jones*, 336 F.3d at 478 (evidence of subsequent deterioration in condition deemed immaterial); *Wyatt v. Sec'y of Health and Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) (same).

Finally, as to the good cause requirement, the Sixth Circuit applies a stringent standard under which a claimant must provide a valid reason for failing to obtain the additional evidence during the administrative proceedings. *Oliver*, 804 F.2d at 966. "A claimant shows good cause by demonstrating a reasonable justification for the failure to acquire and present the evidence for

inclusion in the hearing before the ALJ." *Ferguson v. Comm'r*, 628 F.3d 269, 276 (6th Cir. 2010) (internal quotations and citations omitted).

Ms. Giddings points to new medical records obtained after the hearing that show positive testing maneuvers provoking pain (Patrick's, FABER, Gillet's, straight leg raise test), decreased range of motion, decreased sensation at the anterior thigh, and additional epidural injections. (Pl.'s Br., ECF #2503). Ms. Giddings also points to an ultrasound, dated more than four months after the ALJ provided his written decision, which shows postoperative changes in the left inguinal region and the pubic adductor origin with underlying tendinosis and chronic avulsive changes corresponding to an area of pain, and enlargement of the ilioinguinal nerve, which corresponded to the area of Ms. Giddings' pain, that could represent postoperative changes or neuritis. (*Id.*). Ms. Giddings notes the ultrasound was ordered in February 2020, before the date of the hearing decision. (*Id.* at 2504). Ms. Giddings also notes that her reports of pain did not change between the date of the hearing and the date of the ultrasound, indicating that her condition was not worsening, and therefore, that the enlargement of the ilioinguinal nerve represented Ms. Giddings' condition at the time of the ALJ's written decision. This argument is persuasive.

As for good cause, Ms. Giddings notes that the ultrasound was ordered in February 2020 just before the beginning of the COVID-19 pandemic, which drastically disturbed medical providers' ability to give care. I recommend the Court find this satisfies the "good cause" standard.

The ALJ's failure to address or consider the FCE is error and precludes this Court from permitting meaningful review. I recommend the Court remand the case to the Commissioner with instructions to address the contents of the FCE report and the evidence Ms. Giddings was unable to present before the issuance of the written decision.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying disability insurance benefits and supplemental security income and **REMAND** this matter for proceedings consistent with this recommendation.

Dated: May 13, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).